UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:10-cr-56 |
| | ) | COLLIER/CARTER |
| JERMAINE HOWARD | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant's Motion to Suppress (Doc. 36) is pending before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Defendant Jermaine Howard seeks to suppress evidence found in a residence at 2039 Ruby Street, Chattanooga, Tennessee on March 12, 2009 and to suppress marijuana found on his person at that residence as a result of a pat down of his person on March 12, 2009. Because the plaintiff has no reasonable expectation of privacy in the place searched, I RECOMMEND that portion of his motion seeking to suppress evidence found at the premises be DENIED. Because the marijuana was found during a pat down search, which I conclude was a lawful *Terry* frisk, and because the marijuana discovered in that search would have been discovered later through an independent source, I RECOMMEND that portion of defendant's motion to suppress be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on Defendant's motion to suppress on March 18, 2011. The government presented three witnesses: Investigator Kevin Trussell, Sergeant Todd Royval and Investigator Rusty Morrison, all employed by the Chattanooga Police

1

Department. The defendant called five witnesses. Based on their testimony, I make the following findings:

On March 12, 2009, a be-on-the-lookout bulletin, known as a "BOLO," was transmitted to Chattanooga, Tennessee police officers. The BOLO informed them of a stolen car which was specifically described by color, make, model and a unique hub cap characteristic involving hubcaps of different size. The BOLO also provided them the area where they might locate the car. Further details on the stolen car had been entered into the National Crime Information Center (NCIC). Minutes after the BOLO, Sergeant Todd Royval and Investigator Kevin Trussell saw the stolen car which completely matched the description given, backed into the driveway in front of a home at 2039 Ruby Street in Chattanooga. Investigator Trussell knocked on the home's front door to find whether anyone was inside, while Royval stood nearby at the front corner of the house. Despite defendant Howard's slow response to the knock (about 15 to 30 seconds, according to Trussell and Royval), at no time did any officer threaten to forcibly enter the home. Once Howard opened the door, the officers learned Howard and Isaac Moore were inside the home. Neither Trussell nor Royval noticed any children although later testimony indicated there were three children somewhere in the house. Isaac Moore denied any knowledge of the car. Howard stated that he was paying for the car, was driving it, and had the keys in his pocket. He did not at that point in time say that he had violated any agreement with the owner.

Although Trussell knocked on the door, Royval approached and took the lead in questioning the defendant. During the conversation, Royval asked Howard for the keys to the stolen car. Howard touched his pant's pocket and then suddenly said the keys were in the house. Royval noticed his demeanor changed at that point and also noticed a large bulge in his pocket.

In touching his pocket, Howard drew Royval's attention to the large bulge. Concerned for his safety, Sergeant Royval grabbed the bulge and identified the bulge as suspect marijuana in individual baggies. He described them as soft and oblong shaped with packages shaped like a strawberry, smaller on the top and larger on the bottom. He could tell by feel that they were individual baggies. The defendant said it was paper but Royval knew it was not. Based on his training and experience he concluded it was marijuana. Howard's explanation for the bulge was not consistent with what Sergeant Royval felt. Royval retrieved the baggie of suspect marijuana from Howard's pocket.

Royval continued to investigate the car theft. In response to Royval's request for permission to enter the house to retrieve the keys to the stolen car, Howard said he did not live in the house and, therefore, could not give the police permission to enter. Howard added he was about to go pick up the homeowner, Latoya Williams, from her employment. The officers sent a police car to drive Williams home. When Williams arrived she gave a written statement, saying Howard "did not live with me," and, "The other person in my house I (don't know) [*sic*]." Williams gave written consent to the officers for a search of her home. Williams verbally added that she was willing to give consent, even though she did not know what the police were searching for, because she did not have anything to hide. In her testimony at the March 18, 2011 hearing, Williams confirmed she was not in any way coerced and testified she freely gave consent to search her house. She confirmed that the defendant did not live in the house and was not an overnight guest.

Williams entered her home at the same time as the officers. During the consent search officers located a loaded short-barrel shotgun and additional shells in the master bedroom and

3

Howard's clothing and papers throughout the house. Williams said she had not ever seen the shotgun before. On some of Howard's papers he had listed the Ruby Street address as his residence. Pictures in the house showed Howard making gang signs.

After the short-barrel shotgun was discovered, a friend of the victim of the "car theft," Shaun Steven Kidd, came to the Ruby Street house while the police officers were still present. Kidd identified Howard as the buyer of the car but then described a sales agreement between Howard and himself which Howard had violated by failing to make the agreed-upon payments. Only at this time did the officers determine the ownership of the car was an issue that could be a civil matter rather than a theft. Kidd testified at the hearing, as did Jacinda Renee James who is the person who reported the vehicle stolen and is the owner of the "stolen" car. Their testimony was not the model of clarity but it appears the defendant Howard was a friend of Kidd. There was some sort of sales arrangement where Howard agreed to buy the care and make payments. He did not and both James and Kidd went to the police station to report the theft of the car. In any event, both Kidd and James confirmed they were at the police station making a report. The result of that report was the BOLO which gave rise to this investigation.

Some time after finding the short-barrel shotgun, officers interviewed Howard after a waiver of his *Miranda* rights. Howard affirmed that the shells in the dresser drawers were similar to the shells in the shotgun and he–Howard–had purchased the shells at Wal-Mart, as reported by Kidd. During the testimony, Kidd seemed to say that Howard was present when someone else purchased the shotgun shells.

The investigation related to the theft of the car led to the police obtaining lawful consent to search the residence which led to the discovery of the shotgun and Howard's arrest.

### III. Analysis

*A. The Search at 2039 Ruby Street, Chattanooga, Tennessee.*

Defendant argues because the defendant refused permission to search the residence and the police had no search warrant, they had no right to continue the search even though Latoya Williams, the owner of the house, freely consented to the search. He relies on *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006) where the Supreme Court held that when two persons share access to a residence, and both are present and one refuses consent, the search is not valid even though the other consents. Before the undersigned reaches this issue, however, I must first look at whether the defendant had a reasonable expectation of privacy in the premises searched.

In his motion to suppress and his memorandum in support thereof, the defendant points to several documents found in the house addressed to him at 2039 Ruby Street. There was a Comcast bill, and application for a Tennessee Driver's License, bearing his name and the Ruby Street address. He argues these documents clearly established he was a resident (Doc. 36, Motion to Suppress p. 3). However, when asked by the officers at the scene for consent, Howard replied that he did not live there and could not give permission to search the house. Further, the defendant's own witness, Latoya Williams, who lived at 2039 Ruby Street, confirmed that although Mr. Howard would come and visit at her house and would sometimes babysit, he never stayed overnight.

"'It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.'" *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir.2001)). Absent a legitimate expectation of privacy in the premises searched, the Fourth Amendment offers no protections to the defendant against police intrusions into the premises searched. *See United States v. Hunyady*, 409 F.3d 297, 300 (6th Cir. 2005) (the "capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

"To establish a legitimate expectation of privacy, a defendant must satisfy a two-pronged test: 1) he must manifest an actual, subjective expectation of privacy, and 2) that expectation must be one that society is prepared to recognize as legitimate." *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005) (citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir.2000)).

In the instant case there is no evidence to support a legitimate expectation of privacy. Defendant has vehemently asserted he was not residing on the property at the time of the search.

Even though the defendant does not reside at the premises in question, he could still assert a legitimate expectation of privacy if he were an overnight guest in his father's home. *Minnesota v. Olson,* 495 U.S. 91 (1990). However, he was not an overnight guest according to the testimony of Ms. Williams.

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that

> serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend ....
>
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

*Olson*, 495 U.S. at 98-99.

We know from the testimony that Latoya Williams lived with her three children at the house. The fact that there were some documents in the house with the defendant's name on them cannot establish that the defendant was an overnight guest. At most, the evidence suggests defendant was a casual, temporary visitor at Ms. William's house and was there to be a baby sitter for a brief period of time on the day the search warrant was executed. "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998), *see also*, *United States v. Harris*, 255 F.3d 288, 294-95 (6th Cir. 2001) ("Although an overnight guest may possess a legitimate expectation of privacy in a residence being searched, a temporary visitor to a residence may claim no such protection." *United States v. Plavcak*, 411 F.3d 655, 665 (6th Cir. 2005) ("It is well-settled that a person has no reasonable expectation of privacy where he is neither a resident nor an overnight guest in a residence."); *United States v. Buckner,* 717 F.2d 297*,* 300 (6th Cir. 1983) (Parent-child relationship did not imbue adult son with legitimate expectation of privacy in his mother's apartment where he did not reside with her and

7

was not an overnight guest in her apartment); *United States v. Love*, 70 F.3d 116, 1995 WL 675562 *1, *4 (6th Cir. Nov.13, 1995) (holding that defendant did not have a legitimate expectation of privacy in his mother's house because he moved out six months before the search and was not an overnight guest)(unpublished).

If the defendant were there to babysit and in the process left his shotgun at the home, he would not have a legitimate expectation of privacy. *Minnesota v. Carter*, 525 U.S. 83 (1998). I conclude the defendant has not met his burden to establish a legitimate expectation of privacy in the house. Consequently, the voluntary consent of Latoya Williams to allow the search was not in any way restricted by the defendant's refusal to consent. *Georgia v. Randolph* does not apply to this situation because he did not share access to the residence.

*B. The Pat Down Search of Defendant's Person on March 12, 2009*

Investigator Trussell and Sergeant Royval were at the residence because they had received a BOLO on their car radio. It was reported to them that a car had been stolen. The description of the car was specific as to color, make, model and also included a description of three chrome wheel covers of a large size and a standard wheel cover on the fourth wheel. They came upon a vehicle moments after receiving the BOLO which matched the description of the stolen car in all respects. The vehicle was parked directly in front of the door at 2039 Ruby Street. Investigator Trussell knocked on the door while Sergeant Royval watched at the front corner of the house. After a brief time Howard came to the door along with another individual. In a brief conversation, Investigator Trussell asked about the car and told him and the other individual to step out on the porch. Howard was seated near the front door. Royval took over the questioning. When asked about the stolen car, Howard indicated he was driving the car, was

in the process of paying for it, and had the keys to it in his pocket. Howard touched his pocket and then suddenly said the keys were in the house. Royval noticed his demeanor changed at that point and also noticed a large bulge in his pocket. He suspected a weapon might be in his pocket so he immediately did a pat down and felt the object. It was soft and oblong shaped with packages shaped like a strawberry, smaller on the top and larger on the bottom. He felt what seemed to be individual baggies. The defendant said it was paper which Royval knew was not so. Royval immediately concluded, based on his prior training and experience, that it was marijuana. He then retrieved the marijuana.

Howard argues once he told the police the car was not stolen and he was paying for it, this should have clearly shown the police were being used to repossess the vehicle and no theft had occurred (Doc. 36, Motion to Suppress at 2). I disagree. The bare explanation that there was no theft by the person they suspected to be the thief was not sufficient to require the police to abandon the investigation. The vehicle was reported stolen, the vehicle found was an exact match and the VIN number also matched the described stolen car. Here the officer is investigating a theft. The defendant Howard was not known to the officers except as a suspected thief. There was no reason to abandon the investigation.

A *Terry* stop or investigatory stop occurs when a police officer briefly detains a person without probable cause to investigate a possible crime. *See generally, United States v. Bailey*, 302 F.3d 652 (6th Cir. 2002). In order to conduct a *Terry* stop, an officer must have a reasonable suspicion based on specific and articulable facts that the individual he seeks to detain is involved in criminal activity. *United States v. Arvizu*, 534 U.S. 266, 750 (2002); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Bailey,* 302 F.3d at 658. Reasonable suspicion is a "less demanding

standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). In this regard, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id*. Here the suspicion was that Howard had a stolen car.

During a *Terry* stop, a police officer may conduct a limited search for concealed weapons, if the officer believes that a suspect may be dangerous. *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993). "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may conduct a limited protective search for concealed weapons. The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. at 146 (1972). Because the search must "be strictly circumscribed by the exigencies which justify its initiation," *United States v. Strahan*, 984 F.2d at 158, the search "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer." *Id*. (citation omitted).

An officer is entitled to conduct a limited patdown or frisk of the suspect's person for weapons if he has an articulable and reasonable suspicion to believe the suspect is armed. *Michigan v. Long*, 463 U.S. 1032, 1051 (1983), *Mimms*, 434 U.S. at 111-12; *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Terry*, 392 U.S. at 29; *United States v. Williams*, 962 F.2d 1218, 1223 (6th Cir.), *cert. denied*, 506 U.S. 892 (1992)(officer may search for weapons "if a reasonably prudent officer in the same circumstances would be justified in believing that his safety or that of others was threatened"). As long as the officer has such reasonable suspicion sufficient to allow a patdown of a suspect for weapons, other contraband such as drugs may be seized if they are discovered during the course of the frisk. *United States v. Walker*, 181 F.3d 774, 1778-779 (6th

10

Cir. 1999), *cert. denied*, 528 U.S. 980 (1999) (upholding seizure of crack cocaine found when officer felt a bulge in defendant's pants during patdown search for weapons).

In this case, I conclude Royval had sufficient reason to fear for officer safety. Although he had no prior contact with defendant, he was investigating the theft of a car parked directly in front of 2039 Ruby Street. He knew the defendant was driving the car which was reported stolen. The reason for the patdown was the statement of defendant that the key was in his pocket, then the abrupt change: he touched his pocket, his demeanor changed and he said no, the key is in the house. Royval then saw the large bulge in the defendant's pocket. Royval was investigating a theft and the change from defendant saying the keys were in his pocket to no, they were in the house seemed suspicious to him. The presence of weapons is a constant danger to police officers. Although a car thief is dishonest, that may not automatically mean they are dangerous. I conclude however that the change in demeanor and the presence of the visible bulge was enough to allow a limited pat down search, a limited intrusion. Even if the search was not constitutional based on the pat down of defendant, I conclude the marijuana would have been inevitably discovered through an independent source of investigation. The search of the residence was based upon a valid consent from the homeowner which led to the arrest of defendant for possession of the short-barrel shotgun.

*C. Independent Source Doctrine or Inevitable Discovery*

The government concedes that if one assumes Sergeant Royval improperly seized marijuana from Howard and the police investigation ended at the threshold, then the marijuana would not be admissible. However, the investigation did not stop at the threshold. The officers continued an independent investigation and properly obtained consent for a search of the home,

11

located an illegal short-barrel shotgun, and arrested Howard for possessing the weapon. Where a defendant asserts a constitutional violation, "evidence will be admitted if the government can show it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (*quoting Nix v. Williams*, 467 U.S. 431, 442-3 (1984)). The investigation into the stolen car and the obtaining of lawful consent formed the existence of an independent, untainted investigation that led to the discovery of the shotgun and Howard's arrest. Thus, the officer's discovery of the marijuana was inevitable, and the marijuana would be admitted.

The independent source doctrine or the inevitable discovery doctrine can apply to allow admission of the marijuana regardless of whether the *Terry* patdown was unlawful. The Sixth Circuit set forth the basic parameters of the independent source doctrine in *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996):

> Under the independent source doctrine, evidence will be admitted if the government can show it was discovered through sources "wholly independent of any constitutional violation." *Nix,* 467 U.S. at 442-43, 104 S.Ct. at 2508-09 (1984). The doctrine ensures that the government is not penalized for wrongdoing when such wrongdoing would not bear on the outcome of the case. "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source unrelated to and independent of the unconstitutional search." *Murray v. United States,* 487 U.S. at 538-39, 108 S.Ct. at 2534 (quotation and citation omitted).

*See also*, *United States v. Dice*, 200 F.3d 978, 983-84 (6th Cir. 2000); *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir.1984).

In this case there is evidence in the record of a source leading to the recovery of the marijuana on March 12, 2009, which is independent of the patdown itself. The officers were

investigating the stolen vehicle and were looking for the key which was inside the residence. Voluntary consent to search was obtained from the owner of the house which led to the recovery of the key. During the search the short-barrel shotgun was found and evidence developed connecting defendant to the shotgun. Howard was arrested for possession of the shotgun. The defendant would have been searched incident to that arrest independent of the pat down for officer safety. The record therefore supports the application of the independent source doctrine in this instance.

While the independent source doctrine operates by focusing on the means which *were* actually used to obtain evidence, the inevitable discovery doctrine focuses on the means by which evidence *would* have been discovered had the police continued in a line of investigation which it had already begun:

> Under the inevitable discovery doctrine, illegally seized evidence may be admitted despite the exclusionary rule if the government can prove that it would have obtained the evidence from lawful sources even if the illegal seizure never happened. *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). The government can prove this either by showing that "an independent, untainted investigation ... inevitably would have uncovered the same evidence or [by showing] other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id.*

*United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999), *cert. denied,* 528 U.S. 1161 (2000). The government must prove its burden by a preponderance of the evidence. *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990); also see *U.S. v. Kennedy* 61 F. 3d 494 (6th Cir. 1995). The crucial question in this analysis is whether the police were simultaneously in the process of an independent, untainted, ongoing investigation or in hindsight predicting what might have happened *if* an independent investigation had been conducted. Courts within this circuit

have consistently refused to apply the doctrine where police failed to show an independent, ongoing investigation which would have led quickly to the evidence. *See e.g., Ford*, 184 F.3d at 577 (the inevitable discovery doctrine did not apply where the IRS failed to show it had, in fact, initiated an independent line of investigation and was "hot on the trail of the disputed evidence"); *United States v. Johnson*, 22 F.3d 674, 683-84 (6th Cir. 1994) (evidence seized during an illegal search of a residence was not admissible under the inevitable discovery doctrine simply because the police could have obtained a search warrant if they had applied for one; the government must show a legal process was already in place which would have led inevitably to the evidence); *United States v. Brown*, 69 F. Supp.2d 925, 932-33 (E.D. Mich. 1999) (evidence seized in residence during an overly broad protective sweep was still admissible under the inevitable discovery doctrine where a valid consent to search was obtained at the same time the improper sweep was being conducted.)   In this case, while the officers were conducting their own, independent investigation of the March 12, 2009 report of a stolen car and focused on Howard as a suspect, they obtained consent to search the residence.  There is nothing in the record to contradict the conclusion that this independent investigation would have inevitably and *quickly* led to the search of the defendant's person, a search incident to the arrest for possession of the shotgun.

## IV. Conclusion

Because the defendant did not have a legitimate expectation of privacy in the premises searched, I RECOMMEND that his motion to suppress as to evidence found on the premises be DENIED. Further, I RECOMMEND defendant's motion to suppress the marijuana seized from his person on March 12, 2009 be DENIED for the reasons stated herein.[1]

          *s/William B. Mitchell Carter*
          UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).