UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )     1:10-CR-56 |
| v. | ) |
| | )     Collier/Carter |
| JERMAINE HOWARD | ) |

**MEMORANDUM**

On December 7, 2010, Defendant Jermaine Howard ("Defendant") filed a motion to suppress evidence found in a residence at 2039 Ruby Street, Chattanooga, Tennessee on March 12, 2009 and to suppress marijuana found on his person as a result of a pat down performed on the same date (Court File No. 36). This motion was referred to United States Magistrate Judge William B. Mitchell Carter, who held a hearing and subsequently filed a report & recommendation ("R&R") recommending Defendant's motion be denied (Court File No. 68). Defendant timely objected (Court File No. 69), and the government responded (Court File No. 70). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 68). Accordingly, Defendant's motion to suppress will be **DENIED** (Court File No. 36).

**I.  RELEVANT FACTS**

With one exception, which will be noted, Defendant does not challenge the Magistrate Judge's account of the testimony and evidence presented at the hearing, which the Court hereby adopts by reference (Court File No. 68, pp. 1-5). The Court will only briefly summarize the testimony and evidence necessary to this Memorandum.

On March 12, 2009, a be-on-the-lookout bulletin, known as a "BOLO," was transmitted to Chattanooga police officers. The BOLO was for a stolen vehicle, and described the car's color,

make, model, and unique hub cap configuration. The BOLO also described where the car was most likely to be located. Minutes after receiving the BOLO, Sergeant Todd Royval and Investigator Kevin Trussell saw the stolen car, which was backed into the driveway in front of a home at 2039 Ruby Street in Chattanooga.

Trussell knocked on the home's front door, while Royval stood nearby at the front corner of the house. After an interval of 15 to 30 seconds, Defendant opened the door. Once Defendant opened the door, the officers learned Defendant and Isaac Moore were inside the home. The officers asked the two men about the car. Moore denied any knowledge of the car, but Defendant stated he was paying for the car, was driving it, and had the keys in his pocket.

During the conversation with Defendant, Royval asked Defendant for the keys to the stolen car. Defendant touched his pants pocket, but then suddenly said the keys were in the house. Royval noticed Defendant's demeanor changed at the point, and also noticed a large bulge in Defendant's pocket. In touching his pocket, Defendant drew Royval's attention to the bulge. Allegedly concerned for his safety, Royval grabbed the bulge and identified it as suspect marijuana in individual baggies. Royval described them as soft and oblong shaped, like "strawberries" – smaller on the top and larger on the bottom. He could tell that they were individual baggies. Defendant said his pocket contained paper, but this description was inconsistent with what Royval felt. Based upon his experience, Royval concluded Defendant's pocket contained marijuana. Royval was right; he retrieved a baggie of marijuana from Defendant's pocket.

After finding the marijuana, Royval continued to question Defendant about the stolen car. Royval asked Defendant for permission to enter the house to retrieve the car keys, but Defendant told Royval he did not live in the house and, therefore, could not give the police permission to enter.

2

Defendant further stated he was about to go pick up the homeowner, Latoya Williams, from her workplace. The officers sent a police car to pick up Williams. When Williams arrived home, she signed a written statement saying Defendant "did not live with me," and, "The other person in my house I (don't know) [*sic*]." Williams gave the officers written consent to search her home. Williams verbally added she was willing to give her consent because she did not have anything to hide. In her testimony at the suppression hearing, Williams confirmed her consent was freely given and she was not in any way coerced. She confirmed Defendant did not live in the house with her, and was not an overnight guest, though the two did have sex sometimes. Williams stated that on the date in question, Defendant was babysitting her children at her house.

Williams entered her home with the officers. During the search, officers located a loaded short-barrel shotgun and additional shotgun shells in the master bedroom. Officers also found clothes belonging to Defendant in the house, as well as some papers listing 2039 Ruby Street as his address.[1] Pictures in the house showed Defendant flashing gang signs.

After the shotgun was discovered, a friend of the victim of the "car theft," Shaun Steven Kidd, came to the Ruby Street house while the officers were still present. Kidd identified Defendant as the buyer of the car, but stated Defendant had failed to make payments on the car pursuant to a sales agreement between Defendant and Kidd. It was only at this time the officers determined the ownership of the car was essentially a civil, not criminal issue. Kidd testified at the hearing, as did Jacinda Renee James, who is the person who reported the car stolen and is the owner of the car. Their testimony indicated that James had commissioned Kidd to sell the car on her behalf, and

---

[1]Specifically, a Comcast bill and Tennessee driver's license application. Williams testified that Comcast would not let her sign up for cable in her own name because of a past billing issue, so she used Defendant's name.

3

Defendant had entered into a sales agreement wherein he agreed to buy the car from James. Defendant did not make the required payments, so Kidd and James went to the police station and reported the car as stolen. This report resulted in the issuance of the BOLO.

Defendant was arrested for possessing the shotgun. Some time later, officers interviewed Defendant after he waived his *Miranda* rights. Defendant affirmed that the shells in the dresser drawer were similar to the shells in the shotgun, and admitted he had purchased the shells at Wal-Mart.[2]

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection is made, 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III. DISCUSSION

Defendant objects to each of the legal conclusions made by the Magistrate Judge, to wit: (1)

---

[2]In his objection to the R&R, Defendant denies this interview took place. The government represents it did take place, and states the report of this interview is among discovery materials provided to Defendant. At any rate, this factual dispute is not material to the suppression issue.

4

the shotgun should not be suppressed because Defendant had no reasonable expectation of privacy in the residence at 2039 Ruby Street; and (2) the marijuana should not be suppressed because (a) the pat down search of Defendant was a lawful *Terry* frisk, and (b) even if the pat down search was unlawful, the marijuana would have inevitably been discovered through an independent source. The Court will conduct *de novo* review with respect to each of these points.

**A. Search of 2039 Ruby Street**

Defendant "object[s] to the [Magistrate Judge]'s conclusion that the [Defendant] had no reasonable expectation of privacy in the search of the home at 2039 Ruby Street."[3] However, the Court agrees with the Magistrate Judge's conclusion.

"It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quotation omitted). To establish a legitimate expectation of privacy, a defendant must satisfy a two-pronged test: "1) he must manifest an actual, subjective expectation of privacy, and 2) that expectation must be one that society is prepared to recognize as legitimate." *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005) (quotation omitted).

Here, Defendant cannot establish a legitimate expectation of privacy. As a threshold matter, it is clear Defendant had no residence-based privacy interest in the house. It is undisputed Defendant did not live at 2039 Ruby Street; in fact, Defendant himself relied on this fact when explaining to officers that he had no authority to consent to a search of the house because he did not

---

[3]Defendant does not elaborate on this objection beyond the quoted sentence.

live there.[4]

Even if a non-resident, an individual may possess a legitimate expectation of privacy in a residence if he is an overnight guest there. *See Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990). However, such was not the case here. Uncontroverted testimony reveals Defendant was at most an occasional visitor at the residence, who periodically came over for sex and babysitting, but who did not spend the night. On the date in question, Defendant was at the residence because he was babysitting Williams' children. These circumstances did not give Defendant a legitimate expectation of privacy in the residence. *See United States v. Harris*, 255 F.3d 288, 294-95 (6th Cir. 2001) ("Although an overnight guest may possess a legitimate expectation of privacy in a residence being searched, a temporary visitor to a residence may claim no such protection."); *United States v. Plavcak*, 411 F.3d 655, 665 (6th Cir. 2005) ("It is well-settled that a person has no reasonable expectation of privacy where he is neither a resident nor an overnight guest in a residence.").

Because Defendant had no legitimate expectation of privacy in 2039 Ruby Street, the search of the residence did not violate his Fourth Amendment rights. Accordingly, the Magistrate Judge properly concluded the shotgun found in the residence should not be suppressed.

**B. Pat Down Search of Defendant**

Defendant objects to the Magistrate Judge's conclusion that the pat down search of his

---

[4]Although Defendant does not make this argument in his objection, in his motion to dismiss Defendant likens the present facts to those which led to suppression in *Georgia v. Randolph*, 547 U.S. 103 (2006). However, *Randolph* is inapposite. In *Randolph*, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. at 120. Here, the house at 2039 was not a "shared dwelling," and Defendant did not "expressly refuse" consent to search – rather, he represented he had no authority to consent to a search because the house was not his.

6

person was a lawful *Terry* frisk, and that even if not, the marijuana found in Defendant's pocket would be admissible pursuant to the independent source doctrine or the inevitable discovery doctrine. The Court concurs with the Magistrate Judge.

A *Terry* stop occurs when a police officer "briefly stop[s] and detain[s] an individual for investigative purposes if he has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if he lacks probable cause." *United States v. Bailey*, 302 F.3d 652, 658 (6th Cir. 2002) (quotation omitted). "[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). During a *Terry* stop, if an officer "believes that a suspect may be dangerous, the officer may conduct a limited search for concealed weapons." *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993). However, this search must "be strictly circumscribed by the exigencies which justify its initiation." *Id*. An officer may conduct a *Terry* frisk for weapons if "a reasonably prudent officer in the same circumstances would be justified in believing that his safety or that of others was threatened." *United States v. Williams*, 962 F.2d 1218, 1223 (6th Cir.), *cert. denied*, 506 U.S. 892 (1992). So long as the officer had a reasonable suspicion justifying a *Terry* frisk, other contraband such as drugs may be seized if they are discovered during the frisk. *United States v. Walker*, 181 F.3d 774, 778-79 (6th Cir. 1999) *cert. denied*, 528 U.S. 980 (1999).

In this case, the officers had reasonable suspicion to justify a *Terry* stop, and later a *Terry* frisk of Defendant. The officers had received a BOLO for the car parked at 2039 Ruby Street. Pursuant to their investigation of the reported theft, the officers questioned Defendant. Defendant admitted he was driving the car and had the keys to the car, but also asserted he owned the car. This bare assertion of ownership, uncorroborated by title or other evidence, did not require the police to

7

abandon the investigation or conclude Defendant was not a suspect. To the contrary, the police had reasonable suspicion that criminal activity was afoot, and thus were justified in briefly stopping Defendant.

During his conversation with the police, Defendant stated the keys to the car were in his pocket. However, when Royval asked for the keys, Defendant touched his pocket and then suddenly said the keys were in the house. Royval noticed a change in Defendant's demeanor, and also noticed a large bulge in the pocket Defendant had just touched. These circumstances, coupled with Royval's knowledge that Defendant was driving a car which had recently been reported stolen, gave rise to a reasonable suspicion that Defendant may have had a weapon in his pocket. Royval was therefore justified in briefly frisking Defendant for weapons. *See Williams*, 962 F.2d at 1223. That the frisk immediately revealed the presence of drugs, rather than a weapon, does not require suppression of the drugs. *See Walker*, 181 F.3d at 778-79. Accordingly, the Magistrate Judge properly concluded the pat down search did not violate Defendant's Fourth Amendment rights, thus the marijuana should not be suppressed.

Moreover, even if the frisk was not a legitimate *Terry* frisk, the seized marijuana would nonetheless be admissible pursuant to the doctrine of inevitable discovery. "Under the inevitable discovery doctrine, evidence may be admitted if the government can show that the evidence inevitably would have been obtained from lawful sources in the absence of the illegal discovery." *United States v. Leake*, 95 F.3d 409, 412. "The government can prove this either by showing that an independent, untainted investigation inevitably would have uncovered the same evidence or by showing other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (quotation omitted). This

doctrine does not allow rampant speculation on future police conduct. Rather, "the government's evidence about what police would have done must bow to contrary evidence about what they actually did." *Id*. In other words, the government must show that an independent, ongoing investigation would have inevitably and quickly led to the disputed evidence. *See id.*; *see also United States v. Johnson*, 22 F.3d 674, 683-84 (6th Cir. 1994).

Here, officers would have inevitably and quickly discovered the marijuana in Defendant's possession through their actual, ongoing investigation into the "stolen" car. Both before, during, and after the pat down search that revealed the marijuana, officers were investigating the theft of the car parked at 2039 Ruby Street. The officers were looking for the key to the vehicle, and obtained the voluntary consent of the homeowner to search the home. During the search, the short-barrel shotgun was found, and evidence was developed associating Defendant with the shotgun. Defendant was immediately arrested and charged with possession of the shotgun. This development, wholly apart from the prior pat down, would have inevitably and swiftly led to a search incident to arrest which would have revealed the marijuana. Accordingly, the Magistrate Judge properly determined that even if the pat down search of Defendant was unlawful, which it was not, the marijuana would nonetheless be admissible pursuant to the inevitable discovery doctrine.[5]

## IV.    CONCLUSION

After reviewing the record, the Court finds the Magistrate Judge properly concluded that Defendant did not have a legitimate expectation of privacy in the premises searched, the pat down

---

[5] Though the inevitable discovery and independent source doctrines are quite similar, perhaps even overlapping at times, the Court believes the former is most applicable here, and so declines to adopt the Magistrate Judge's application of the independent source doctrine.

search of Defendant's person was lawful, and, at any rate, the marijuana in his possession would have been inevitably discovered. Accordingly, with the exception of the Magistrate Judge's application of the independent source doctrine, the Court will **ACCEPT** and **ADOPT** the R&R (Court File Nos. 68). Defendant's Motion to Suppress will be **DENIED** (Court File No. 36).

**An Order Shall Enter.**

/s/
**CURTIS L. COLLIER
CHIEF UNITED STATES DISTRICT JUDGE**